ROCK MANUFACTURING COMPANY AND OTHERS *vs.* WILLIAM C. HOUGH AND OTHERS.

The petitioners and respondent, being respectively the proprietors of mills and mill sites upon a stream, for the purpose of erecting a permanent dam across the stream, thereby to furnish their mills with an increased and more constant supply of water, entered into an agreement with each other by which each of the parties was to contribute a certain sum toward the expense of erecting the dam, which it was agreed should remain a permanent dam for their use and benefit. In pursuance of the agreement a dam was erected, forming a large and valuable reservoir for the common use and benefit of the parties, the expense of which was borne by them according to the terms of the agreement. The erection of the dam greatly enhanced the value of the mill sites, and increased the power and capacity of the stream for manufacturing purposes, in consequence of which the petitioners erected large mills, and largely increased the quantity of their machinery, at great expense. During times of drouth, and during the dry season, the mills of the petitioners depended for a supply almost entirely upon the reserved water in the reservoir; and it was the custom of all the parties to draw water from the reservoir in sufficient quantity to run their mills only during the usual working hours of each day, and to shut the gate of the reservoir during the night, and this was the only mode which could be adopted to prevent a waste of water in the dry season, and to use it to the best advantage to all interested. The respondent's mill, which had a large and deep pond connected with it, was situated on the stream above the mills of the petitioners, and the petitioners could get the water from the reservoir only by drawing enough from it to fill the respondent's pond and cause it to flow over his dam. During a very dry season, when the water in the stream was low, all the mills on the stream depended on the water in the reservoir for power to operate their machinery, and water sufficient for that purpose was drawn from the reservoir during the usual working hours in each day, in the same manner as it had before been accustomed to be drawn during similar seasons. During that season the respondent's pond would be filled during the day, and kept filled, by the water drawn from the reservoir for operating the mills, and would be full and the water running over his dam at night, when the gate at the reservoir was closed at the usual hour. After the gate of the reservoir was closed, the respondent was accustomed to run his mill during the night, as long as the water in his pond furnished a sufficient head. The respondent's pond was thereby drawn down, and the petitioners were consequently obliged to wait for water until it was filled again, to the serious injury of their business, and the water in the reservoir at last failed altogether, in consequence of its waste by the respondent and the dryness of the season, until the petitioners' mills were compelled to remain idle for want of water.

Held, that the intention of the parties to the contract, under which the reservoir was constructed, was that they should all consult each other's interests, and use the water only during the usual working hours of each day, in dry seasons,

when all· could use it to advantage, and that the use made of it by·the respondent in the night time in the dry season was unreasonable, in violation of the real meaning and intent of the contract, and should be restrained by injunc.ion.

PETITION for an injunction ; brought to the Superior Court for Tolland county, and referred to a committee, who found the following facts :

On the 23d of December, 1846, the Rock Manufacturing Company, the Stone Mill Company, the Leeds Company, the New England Company, the Springville Manufacturing Company, the Frank Company, part of the petitioners, the Hockanum Company, Phineas Talcott of Vernon, and David Hale of the city and state of New York, were each the owners of a mill site or sites on Hockanum river, in the town of Vernon, and each of said parties then was the owner ot a manufactory erected on said mill sites, driven and worked by the water power of Hockanum river, or was contemplating the erection of such a manufactory, and Allen Howard, one of the petitioners, was largely interested in several· of said manufactories and mill sites. The several companies abovenamed were desirous of increasing the water power of Hockanum river for manufacturing purposes, by raising Snipsic pond, so called, at the head of the river, so as to form a reservoir for their common benefit, for the purpose of furnishing their several manufacturing establishments with an increased and more constant supply of water than they then had. To accomplish the object they entered into the following agreement:

" Whereas the subscribers are owners of or interested in mills or manufacturing establishments situated in Rockville society, in the town of Vernon, in the county of Tolland, upon the Hockanum river, and for the purpose of furnishing said establishments with an increased and more constant supply of water. than they now have are desirous of having a permanent dam erected across said stream, at or near the outlet of Snipsic pond, the source of said river, and near to, and at least ten feet higher than, the present dam, situated near said outlet. And whereas by means of erecting such dam more land will be flowed than hitherto has' been, which it will be

necessary to purchase. Now we, the subscribers, mutually each for himself and themselves, respectively with the others, agree to contribute, bear and pay, toward the erection of such dam, and the purchase of said lands, the sums severally set to our names, if the whole aggregate amount subscribed shall be necessary for the purpose aforesaid, and if not, such parts thereof as shall bear to the whole amount so necessary the same proportion as the sums set to our names respectively bear to the aggregate amount subscribed. And if more than the whole amount subscribed shall be necessary for the purposes aforesaid, that we will then severally and respectively contribute, bear and pay, in the same proportion, such further sums as shall be so necessary. Subject, however, to the limitation that no one of the parties hereto shall be required or under obligation to contribute, bear, or pay, such proportion, or any proportion, of any excess over and beyond the aggregate amount of twelve thousand dollars. And it is furthermore mutually agreed that the deeds and conveyances of said land so to be purchased, as aforesaid, shall be taken to and in the name of the Rock Manufacturing Company, a corporation by the laws of this state, located and established in Rockville society, aforesaid, and one of the subscribing parties to this instrument, and to their successors, in trust for the use and benefit of themselves and others interested in said pond, under or by virtue of this agreement, and their successors, heirs and assigns. And it is hereby further agreed, that said dam so to be built shall be and remain a permanent dam for the use and benefit of themselves and others interested in said pond, under or by virtue of this agreement, and their successors, heirs and assigns. And it is hereby further agreed that said dam, so to be built, shall be and remain a permanent dam for the use and benefit of the parties hereto, their successors, heirs and assigns ; and for the faithful performance of this agreement the parties respectively bind themselves and their successors, heirs, executors, administrators and assigns, respectively.

And it is furthermore agreed that this instrument shall not be binding or obligatory upon the parties subscribing the same,

or either of them, until the subscriptions thereto shall in the aggregate amount to six thousand and five hundred dollars.

Dated at Vernon, the 23d day of December, A. D., 1846.

| | |
|---|---|
| Rock Manufacturing Co., George Kellogg, agent, | Twelve hundred dollars. |
| Stone Mill Co., George Kellogg, agent, | Four hundred dollars. |
| Leeds Company, S. P. Rose, agent, | One thousand dollars. |
| New England Company, Allen Hammond, agent, | Ten hundred dollars. |
| Frank Co., George Lee, agent, | Five hundred dollars. |
| Springville Manufacturing Co., Alonzo Bailey, agent, | Six hundred dollars. |
| Hockanum Co., Alonzo Bailey, agent, | Three hundred dollars |
| J. N. Stickney, | Nine hundred dollars. |
| Phineas Talcott, | Four hundred dollars. |
| Allen Hammond, | One hundred dollars." |

J. N. Stickney was then the agent of David Hale, and subscribed said sum of nine hundred dollars at the request and for the benefit of said Hale, and as such agent. Afterward, in the year 1847, the parties purchased the lands necessary to be flowed, and erected the dam at or near the outlet of the pond, ten feet higher than the old dam at the outlet, and thereby created and formed a large, extensive and valuable reservoir, for the common use and benefit of the parties, and their manufacturing establishments, and the deeds and conveyances of all the lands so purchased under and by virtue of said agreement were taken to and in the name of the Rock Manufacturing Company, in trust for the several parties, and for the uses and purposes contemplated by the agreement. The whole expense in purchasing the land and erecting the dam was more than twenty thousand dollars, and this expense was borne and defrayed by the several parties in proportion to the several sums they respectively subscribed for that purpose.

The mill site and manufacturing establishment then owned by the Frank Company, at the time the agreement was made

and the dam erected, has since by legal conveyances become the property in fee of the Florence Mills, one of the petition ers, and the Florence Mills are the sole owners thereof, and of the equitable interest of the Frank Company in the reservoir and the use of the water therefrom.

Phineas Talcott, after the erection of the dam, conveyed the mill site then owned by him, and all his equitable interest in the reservoir, and to the use of the water thereof, to the American Mills, one of the petitioners, and the American Mills are now the sole owners thereof. The mill site and manufacturing establishment which was owned by David Hale at the time the agreement was made and the dam erected, has. by legal conveyances become vested in, and is now the property in fee of, Albert Dart, one of the respondents, who is now not only the owner of the mill site and manufacturing establishment, but also of all the interest which David Hale or J. N. Stickney had in the reservoir and the use of the water therefrom; and said equitable interest is nine sixty-fifths of the whole.

The dam was erected in 1847, and the reservoir was raised and formed in the beginning of the year 1848, and since that time the reservoir has been used and managed for the common use and benefit of the petitioners, and the owners for the time being of the mill sites now belonging to Dart. The erection of the dam and raising the reservoir as aforesaid very greatly enhanced the value of the mill sites, and more than doubled the power and capacity of the stream for manufacturing purposes; in consequence whereof the petitioners have erected large mills, and have largely increased the quantity of their machinery, the mills and machinery being adapted to the increased power and capacity of the stream for manufacturing purposes. The reservoir has at all times since the dam was raised and finished, until the summer of 1864, furnished an abundant and never failing supply of water power to run the mills and machinery during the usual working hours of each day, through all seasons of drouth, and during the dry seasons of the year.

The petitioners have more than six hundred thousand dol-

lars invested in the mills and machinery, and give employ-
ment to more than eight hundred employees, and the peti-
tioners have done a very extensive and profitable business
since the reservoir was so raised. During times of drouth,
and during the dry season of the year, the mills depend
almost entirely upon the reserved water in the reservoir for
power to run the mills and machinery, and to keep their labor-
ers and workmen employed; and the dams belonging to the
several mills of the petitioners only pond a small quantity of
water, and are adapted to raising the necessary head of water
to operate the mills, but depend for a supply upon the water
drawn from the reservoir.

Since the reservoir was so raised it has been the custom
of the parties to appoint a committee from time to time to
take charge of it, and to regulate the drawing of the water
from it; and it has been the custom during the dry season to
draw water from the reservoir in sufficient quantity to run
their mills and machinery only during the usual working
hours of each day, and to shut the gate to the reservoir dur-
ing the night season, so that the water should not escape or
be wasted, and this is the only mode which can be adopted to
prevent a waste of the water in the dry season, when there is
no water passing over the reservoir dam, and to use it to the
best advantage to all those interested. The usual working
hours at Rockville in the mills are from six o'clock in the
morning to half-past six in the evening.

The Stone Mill Company, one of the petitioners, are the
owners of the first mill site on the stream below the reser-
voir, and Albert Dart is the owner of the mill site next
below that of the Stone Mill Company. The mill site of Dart
is situated on the stream above those belonging to the rest
of the petitioners.

Dart has connected with his mill site a large and deep pond,
whereby he is able to detain a large amount of the water as
it is drawn from the reservoir, and the petitioners whose mills
are situated on the stream below him can get the water from
the reservoir to their mills only by drawing enough from the
reservoir to fill Dart's pond, and to cause it to flow over his

dam, except when Dart or his tenants draw the water from his pond through his flumes and gates.

On the 1st of April, 1864, Dart leased a portion of his mill site and water power to Wm. C. Hough & Co., the respondents, a body politic and corporate by the laws of this state, who occupied one of the mills on the premises, called the Star Mill, in the manufacture of shoddy, and were engaged in operating the mill up to the time of the service of the petition. The business carried on by Wm. C. Hough & Co. in said mill required only a small capital, and the mill did not require or use as much water to drive the machinery as is required and used by the mills owned by the petitioners.

The season of 1864, after the first of June, was a dry season, and the water in the stream was low, and ceased to run over the reservoir dam on the 9th of May. During that season all the mills on the stream depended upon the water in the reservoir for the power to operate their machinery ; and water sufficient to operate the mills and machinery was drawn from the reservoir during the usual working hours each day, in the same manner that the water had been accustomed to be drawn during similar seasons. During that season Dart's pond would be filled during the day, and kept filled, by the water drawn from the reservoir for the purpose of operating the mills, and would be full, and the water be running over his dam, at night when the gate at the reservoir was closed at the usual hour. After the gate of the reservoir was closed, Wm. C. Hough & Co. would continue to run the shoddy mill during the night, so long as the water in Dart's pond furnished a sufficient head to operate the mills. The pond would thereby be drawn down, and in the morning, when the gate at the reservoir was raised, the water flowing from the reservoir would be detained by Wm. C. Hough & Co., until Dart's pond was filled again, and the petitioners whose mills are situated on the stream below Dart's mills were thereby deprived of the use of the water until the pond was filled, and the water ran over his dam, except so much as was necessary to operate the shoddy mill, which however did not furnish a sufficient amount of water to operate the mills of the petitioners. So

much of the water as was drawn and used by Wm. C. Hough & Co. in the night season was wasted, so far as the interest of the petitioners is concerned, and their mills were often compelled to wait for water in the morning, to the serious detriment of their business, until Dart's pond could be filled, and the petitioners were compelled to raise the gate at the reservoir at an earlier hour in the morning than they otherwise would, in order to fill Dart's pond and reduce the time that they otherwise would have to wait for water to operate their mills. During the latter part of the summer and fall of 1864 there was very little rain, and the quantity of water in the reservoir was constantly reduced by the water drawn to operate the mills, until it finally gave out, and the mills were compelled to remain idle for some time for want of water. The water of the reservoir failed sooner than it otherwise would, in consequence of the water used by Wm. C. Hough & Co. being wasted to. the other mills on the stream, and causing them to draw a larger quantity of water than they otherwise would.

From time whereof the memory of man is not to the contrary, there has been a dam at the outlet of Snipsic pond, three and one half feet high, which raised and kept back such a body of water as would be raised there by such a dam. The water was used as a matter of right by the persons who are mill owners on the stream, and there was anciently a grist mill, saw mill and fulling mill on the stream. In 1821 the Rock Manufacturing Company built their mill on the stream, which was operated by the water drawn from Snipsic pond. At that time there was no mill in existence and operation on the stream between this mill and Snipsic pond. In 1834 the Rock Manufacturing Company purchased the outlet of Snipsic pond, the dam there, and the old Paine mill privilege a short distance below, and the nearest privilege to the pond. They sold the privilege, and the Stone Mill is now erected thereon. The Rock Manufacturing Company in 1834 erected a new dam at the outlet to the pond, three and a half feet high. At the place where Dart's dam is now situated there was an ancient dam, and a saw mill, and a short distance

above a small dam and fulling mill. In 1821 these dams and mills. had fallen into decay, and had not been used for several years.

The saw mill privilege formerly belonged to Simeon Colby, who died in 1825 or 1826, and in 1832 his heirs conveyed the same to Col. McClane. The deed of conveyance contained the following clause: "Also a fulling mill, house and mill-dam standing thereon, with all the privilege of raising the water in said mill pond which was ever possessed by Simeon Colby, deceased." McClane conveyed the property by deed containing a similar clause to the Vernon Company, a body politic and corporate, in 1833. The Vernon Company made an assignment of the property, April 20th, 1840. Their assignee sold and conveyed the property to the Falls Company, a body politic and corporate, June 16th, 1841. The Falls Company conveyed the same to David Hale, November 25th, 1845. Hale died, July 20th, 1849, and his executors conveyed the property to J. N. Stickney and sixteen others, July 19th, 1852, and also by the same deed conveyed to them all of Hale's equitable interest in Snipsic pond reservoir. The said sixteen other persons conveyed all their interest in the property to Stickney, August 7th, 1852, and Stickney conveyed the same to Albert Dart, September 15th, 1862, and Dart leased the premises from April 1st, 1864, to April 1st, 1867, by lease dated May 16th, 1864, to William C. Hough & Co., which lease contains the following clause: " Said lessees shall use said water power to drive said twine mill only during the usual hours of business, but they shall have the right to run said shoddy mill during the night, provided the pond shall not be drawn down more than one foot thereby." David Hale, while he was the owner of the property, conveyed a portion thereof to Phineas Talcott and George Lee, by deed dated May 21st, 1845.

In 1833 and 1834 the Vernon Company erected a dam upon the site of the ancient saw mill dam, and erected a paper mill at or near the site of the ancient saw mill, and in 1834 raised the water in the pond, and began operating the paper mill by the water drawn from the pond. The paper

mill was operated by the Vernon Company or their tenants up to the time of their assignment in 1840, when it lay idle for about two years. There were two wheels to the paper mill, one to drive the machines, and one to drive the engines. The engines required much more water than the machines, and were run nights when the business of the company rendered it necessary. There was some complaint in consequence of said running by the proprietors of the mills below, whenever any inconvenience was occasioned to them thereby, but there was generally very little trouble, as there was generally sufficient water, and when there was not it was so used as to occasion as little inconvenience as possible. .

The mill was started again in 1841, or 1842, by the Falls Company, and run by them or their tenants until they sold to Hale in 1845, and it was used by them in substantially the same manner as by the Vernon Company, running the engines nights when they had occasion.

After the mill was purchased by Hale it was operated as a paper mill, and substantially in the same manner as by the previous parties, up to the time it was sold to Stickney, when it again lay idle for a time. The Star Mill was built in 1849, and operated as a paper mill, in the same manner as the other mills during the time they were owned by Hale, the water to operate the same being drawn from the pond. After the property came into the hands of Stickney, he leased the Star Mill to Hill and Hunter, and stipulated that they should not run nights. The Star Mill did not use water enough to operate the mills below, but when the paper mill which was built by the Vernon Company was in operation it furnished sufficient water for them. Dart's pond is of value to his privilege, as it contains a sufficient quantity of water to run his mills, with a portion of the machinery, for several hours during the night, after the gate has been shut at the reservoir. The pond is supplied by the water drawn from the reservoir, except a small amount which is furnished by two small streams running into it below the reservoir. One of the streams is dry in the dry season of the year, and the other does not furnish a sufficient supply to be of any practical

value for operating machinery, but does add some to the body of water in the pond.

In 1864 Wm. C. Hough & Co., with the consent of the Stone Mill Company, placed a timber three inches in thickness upon the top of Dart's dam, and also placed flush boards from six to twelve inches in width on top of that in the night, during the dry season. These additions to the dam, and the placing on it of the flush boards, were of benefit to Wm. C. Hough & Co., as it gave them a better head of water, and detained more of the water drawn from the reservoir in their pond, and if the flush boards were placed on at night and removed in the morning they would be of benefit to the proprietors below, in retaining the water in Dart's pond during the night, and letting it down for their use in the morning, but no one had a right to add to the effective height of the dam without the leave and consent of the Stone Mill Company.

Wm. C. Hough & Co. ran the Star Mill as a shoddy mill in the summer of 1864, and at night, about the time the gate was shut down at the reservoir, were accustomed to place the flush boards on the dam, and thereby detain the water then in Dart's pond from running off over the dam, and by dusting down the flush boards and the flume to the twine. mill, which was not run during the night, they could run the shoddy mill some hours during the night, until the pond was drawn down below the top of Dart's dam for several inches, and they had not sufficient head of water to operate the mill. They would then start up the shoddy mill in the morning before the water was sufficiently raised by drawing from the reservoir to flow over the dam, but they did not in this way use water enough to operate the mills below, and the mills were frequently compelled to wait until the water ran over the dam, or was so raised that the twine mill could be run, so as to give them the necessary supply of water.

The acts of William C. Hough & Co. in regard to continuing the flush boards on the dam at times during the day, and in draining down the pond in the night below the top of the original dam, and in detaining the water in the morning until a sufficient head was raised to run both the twine and the

shoddy mill were known to and justified by Dart, on the ground that it was the exercise of his lawful right to so use and draw the water from his pond.

At the time of the service of the petition the water in the reservoir was from one to two feet higher than the original dam at the outlet.

Flush boards have been placed on Dart's dam in previous years, at the request of some of the mill owners, and placing them there would be of benefit to those below if they were taken off in the morning, as was the custom. Some of the mills have been run at various times portions of the night season, when there was an abundant supply of water, but there has been no general custom to run nights, (except the mills of Dart as before stated,) and the mills other than Dart's cannot be run nights for any considerable time without drawing water from the reservoir, the gates of which have been uniformly closed at night in the dry season.

Wm. C. Hough & Co. used the water during the night, substantially in the same manner as the prior owners or occupiers of the mill had done, in the prosecution of their legitimate business, and not maliciously, and this use was made under a claim of right so to use it on the part of Dart, but the prior owners and occupiers of the mill site had not been accustomed to detain the water during the usual working hours, but had always suffered sufficient water to pass during the usual working hours to run the mill of the petitioners below, when there was sufficient water being drawn from the reservoir for that purpose.

Dart is in the lawful ownership and possession of all the rights of flowing and of drawing water from the pond which existed in 1834, when the dam was erected by the Vernon Company, and he has not lost any of his rights by abandonment, or by adverse rights acquired by others; and he has not acquired any rights by prescription, as against the petitioners, to use the waters from his pond in the manner claimed by him, but his rights and the rights of the petitioners in that respect remain as at common law in relation to different mill owners upon the same stream, except as the same

may be or are varied by the agreement in relation to the raising of Snipsic pond.

Since the bringing of this petition, the petitioners in connection with others, not however including the respondents, have formed a corporation known as the Rockville Water Power Company, for the purpose of raising the dam at the outlet of Snipsic pond, and increasing the capacity of the reservoir, and have so raised the dam about seven and one-half feet higher than the same was at the date of the petition, and have put in a new gate to draw the water from the reservoir, which is and has been solely under their control.

The Superior Court accepted the report of the committee, and reserved the questions of law arising on the record for the advice of this court.

*A. P. Hyde*, for the petitioners.

*Waldo* and *Bill*, for the respondents.

PARK, J.   This case is controlled by the contract entered into between the petitioners and the respondents' grantors, respecting the building of the reservoir for the purpose of furnishing the respective parties to the contract a constant supply of water to run their several mills.

The controversy in the case is confined to the rights of the parties under the contract in the dry season of the year, when all of the parties depend upon the waters of the reservoir to operate their mills.   It appears in the case that the waters of the reservoir, after leaving the premises of the respondents, descend so rapidly that the ponds of the petitioners are not adapted to receiving and ponding the water for a supply, but they are adapted, and can be adapted, only to raising a sufficient head of water, while the supply is constantly being furnished, and can only be furnished, by the waters as they flow rapidly down from pond to pond.   This was well known to the respondents' grantors at the time the contract was made and the reservoir constructed.

It further appears that the petitioners, relying on the ca-

pacity of the reservoir to furnish a supply of water under the contract, constructed their works in reference to such a supply, and to the entire capacity of the same.

It appears further that the practice always has been, in the dry season of the year, to draw the water from the reservoir only during the usual working hours of each day, and that such practice is the only one that can be adopted to prevent wasting the water, and to enable the parties to the contract and their privies to use it to the best advantage of all concerned.

It further appears that the pond of the respondents is above the ponds of the petitioners, with but one exception, and is capable of containing a large quantity of water. The remaining facts are stated as follows:

"The season of 1864 was a dry season, and the water in the stream was low, and ceased to run over the reservoir dam early in May. All the mills on the stream depended upon the water in the reservoir for the power to operate their machinery, and water sufficient to operate the mills and machinery was drawn from the reservoir during the usual working hours of each day, in the same manner that the water had customarily been drawn during similar seasons. The pond of the respondents would be filled during the day, and be kept filled, by the water drawn from the reservoir for the purpose of operating the mills, and would be full and the water would be running over their dam at night, when the gate at the reservoir was closed at the usual hour. After the gate of the reservoir was closed, the respondents would continue to run their mill during the night, so long as the water in their pond furnished a sufficient head to operate the same, and the respondents' pond would thereby be drawn down, and in the morning when the gate at the reservoir was raised, the water flowing from the reservoir would be detained by the respondents until their pond was filled, and the petitioners would thereby be deprived of the use of the water until the pond was filled, and the water ran over their dam, except so much as was necessary to operate their mill, which did not furnish a sufficient quantity of water to operate the mills of

the petitioners. So much of the water as was drawn and used by the respondents in the night season was wasted, so far as the interest of the petitioners was concerned, and their mills were often compelled to wait for water in the morning, to the serious detriment of their business, until the pond of the respondents could be filled; and the petitioners were compelled to raise the gate at the reservoir at an earlier hour in the morning than they otherwise would have done, in order to fill the pond of the respondents, and thus lessen the time they otherwise would have had to wait for water to operate their mills. In the latter part of the summer and during the fall of 1864 there was very little rain, and the quantity of water in the reservoir was constantly reduced by the water drawn to operate the mills of the petitioners and the respondents, until it finally gave out, and the mills were compelled to remain idle some time for the want of water; and the water of the reservoir failed sooner than it otherwise would have done, in consequence of the use of the water by the respondents as aforesaid."

These are the principal facts of the case, and enough to show that the use which has been made of the water by the respondents, in the dry season of the year, when all the parties to the contract depend, and have to depend, upon the reserved waters of the reservoir to operate their mills, is unreasonable, and is in violation of the real meaning and intent of the contract under which the reservoir was constructed.

It is obvious that the case must be governed by the contract, for it has reference only to times and seasons when there is no water running over the reservoir dam. It is the water that the parties have by virtue of the contract that is the subject of this litigation; and it is therefore of no importance what might be their rights on a natural stream.

During such seasons we think it behooves the parties to this contract to consult each other's interests, and use the water only during the usual working hours of each day, when all can use the water to advantage. We think the parties must have so intended when the contract was made. The reservoir was constructed to meet the emergency of such sea-

sons. It could be of no advantage whatever at other times when there is an abundance of water in the streams flowing over the reservoir dam for milling purposes. The reservoir therefore was intended for times when frugality of its waters would be necessary ; and at such times it could not have been intended by the parties to the contract that one of them might use the water during the night, when the others could not use it to advantage, thus subjecting them to the loss of all beneficial use of one-half of the water, and compelling them to remain idle for a time during the working hours of each day, while waiting for the pond of the respondents to become filled.

We think the temporary injunction should be made perpetual ; and we so advise.

In this opinion the other judges concurred.